# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**REXNORD INDUSTRIES, LLC,**
        **Plaintiff,**

    **v.**                            **Case No. 12-C-0261**

**BIGGE POWER CONSTRUCTORS,**
        **Defendant.**

---

## DECISION AND ORDER

This is a breach of contract case involving two commercial entities, Rexnord Industries, LLC ("Rexnord") and Bigge Power Constructors ("Bigge"). Bigge manufactures and sells cranes and similar equipment for use in heavy industry. In 2009, Bigge agreed to supply a company named Shaw Constructors, Inc. ("Shaw") with two large derricks, which Shaw intended to use to construct nuclear power plants in Georgia and South Carolina. The derricks Shaw ordered are among the largest in the world. After Bigge and Shaw entered into the contract for the derricks, Bigge entered into a separate contract with Rexnord, which is in the foundry business, for the production of twenty-eight steel castings (components made by pouring liquid metal into molds) that Bigge intended to incorporate into the derricks. The contract consists of two purchase orders and a set of "commercial terms" printed on Bigge letterhead.

The purchase price for the castings was approximately $4.5 million. Rexnord manufactured and delivered the castings, and Bigge ultimately accepted them, incorporated them into the derricks, and received full payment from Shaw (less a holdback that is not relevant here). However, Bigge refuses to pay Rexnord the balance that

remains due, which is approximately $1 million.  Rexnord filed this suit in state court to recover that amount.  Bigge removed the case to this court under the diversity jurisdiction, and in addition it filed a counterclaim alleging that Rexnord breached certain provisions of the commercial terms, causing it approximately $1.6 million in damages.

Rexnord's alleged breaches can be divided into two categories.  The first category encompasses breaches of the commercial terms relating to Rexnord's promise to deliver the castings in accordance with a schedule incorporated into the contract.  Bigge contends that Rexnord's delay in delivering the castings caused it to incur additional expenses. Bigge generally describes these as "time-related expenses" associated with "personnel" and "equipment rental."  See Bostrom Declaration ¶ 81, ECF No. 28.  Bigge also states that it had to pay additional compensation to one of its subcontractors, Schuff Steel, because Rexnord's delay required Schuff to "reschedule and re-order its work."  Id.

The other category of breach involves Rexnord's alleged failure to properly perform a "root cause analysis," as required by the commercial terms.  See Quilter Decl. Ex. 1, § 5.3, ECF No. 20.  "Root cause analysis" is not defined in the terms, but the parties agree that it is a detailed engineering analysis of the cause of a defect and the impact it would have on the product's performance.  See Rexnord Resp. to Bigge PFOF ¶ 34, ECF No. 36. Here, the parties agree that Rexnord's duty to perform a root cause analysis was triggered when Rexnord discovered that three of the castings, which were the mast feet for the derricks, had developed internal cracks.  Rexnord conducted a root cause analysis, but Bigge thought that Rexnord's analysis was unsatisfactory.  Bigge thus hired separate consultants to advise it on the condition of the mast feet and also devoted "significant

2

internal resources (both management and engineering)" to solving the problem with the mast feet. Bostrom Decl. ¶ 69.

Rexnord and Bigge have each filed motions for partial summary judgment. Rexnord has moved for summary judgment on Bigge's counterclaim, contending that even if Rexnord had committed the alleged breaches, Bigge would not be entitled to recover anything because all of its alleged damages constitute incidental and consequential damages, which the parties have agreed to exclude pursuant to the following provision in the commercial terms:

> Neither party (including its subcontractors, agents, assignees and affiliates) shall be liable to the other for special, consequential or incidental damages of any kind, and regardless of whether such liability arises in contract, in tort, or by operation of law.

Quilter Decl. Ex. 1, § 17. Bigge has moved for summary judgment on the question of Rexnord's liability for breach of contract. Bigge does not seek summary judgment as to the amount of damages it is entitled to recover in connection with Rexnord's breaches, but it does seek summary judgment in its favor on the question of whether any damages flowing from the breach constitute nonrecoverable incidental and consequential damages. The parties agree that California law, including California's version of the Uniform Commercial Code, applies to their dispute.

I begin with the question of whether summary judgment should be granted on Bigge's counterclaim on the ground that all of Bigge's claimed damages fall within the contract's exclusion of incidental and consequential damages. Initially, I note that Bigge eventually "accepted" all the castings, and so the starting point for an analysis of the remedies available to Bigge is UCC § 2-714, which in California is codified as Cal. Com.

3

Code § 2714. That provision provides that where the buyer has accepted goods "he or she may recover as damages for any nonconformity of tender, the loss resulting in the ordinary course of events from the seller's breach as determined in any manner that is reasonable." Id. § 2714(1). Comment 2 to 2-714 states that the "non-conformity" referred to in 2-714(1) includes "any failure of the seller to perform according to his obligations under the contract." In the present case, Bigge alleges that Rexnord failed to perform two of its obligations under the contract—the obligation to deliver the castings in accordance with the schedule, and the obligation to perform a root cause analysis. Assuming that Bigge proves that Rexnord failed to perform these obligations, Bigge may recover "the loss resulting in the ordinary course of events from" each failure. Damages that flow in the ordinary course from the breach are usually referred to as "direct" or "general" damages. See James J. White & Robert S. Summers, Uniform Commercial Code, Hornbook Series § 11-4a, p. 526 (6th ed. 2010) ("General or direct damages, then, flow 'in the ordinary course' from the seller's breach, as specified in 2-714(1)"). These damages may be contrasted with incidental and consequential damages, which are available under 2-714(3) unless they have been excluded, as they have been here.

In the present case, it is relatively easy to dispose of the argument that Bigge's damages are incidental. The text of 2-715(1) enumerates a list of damages that a buyer may recover as incidental damages, but the actual definition of incidental damage appears in Comment 1 to 2-715. The comment states that the damages listed in the text "are merely illustrative of the typical kinds of incidental damage" and that incidental damages fall into one of three categories: (1) reasonable expenses incurred in connection with the handling of rightfully rejected goods; (2) reasonable expenses incurred in connection with

4

the handling of goods whose acceptance may justifiably be revoked; and (3) reasonable expenses incurred in connection with effecting cover.  See also White & Summers, supra, § 11-3, p. 522; 24 Richard A. Lord, Williston on Contracts § 66:56, p. 668 (4th ed. 2002). Bigge's damages do not fall into any of these categories.  Bigge did not reject the castings, revoke acceptance of the castings, or effect cover by purchasing substitute castings,[1] and thus none of its expenses could be deemed to have been incurred in connection with those acts.

Rexnord points out that the text of 2-715(1) lists "any other reasonable expense incident to the delay" as an example of incidental damage and contends that any damages caused by its failure to deliver the castings in accordance with the schedule falls within this language.  However, delay damages of this sort do not fit within any of the categories identified in Comment 1, and thus they do not appear to be among the kinds of damages the drafters of the UCC had in mind when drafting 2-715(1).  Moreover, the phrase "any other reasonable expense incident to the delay" is vague.  Use of the definite article "the" before "delay" suggests that the reader is being referred to some exact delay that is identified earlier in 2-715(1), yet no such delay is identified there or anywhere else.  Thus, it is not clear what "the delay" refers to.  However, given that the preceding forms of incidental damage identified in 2-715(1) and the kinds of incidental damage identified in Comment 1 relate to expenses associated with rejecting goods and effecting cover, the

---

[1]"Cover" is the UCC term for purchasing substitute goods when the seller fails to deliver acceptable goods.  See Cal. Com. Code § 2712(1).  In one of its briefs, Rexnord contends that some of Bigge's damages were incurred in connection with effecting cover, see Reply Br. at 6, ECF No. 35,  but it does not explain how that could be so, since Bigge never effected cover in the first place.

most reasonable interpretation is that "the delay" refers to some delay associated with those acts. Again, in the present case, Bigge did not reject the castings or effect cover by purchasing substitute castings, and so Bigge's delay-related damages do not constitute incidental damages. I thus proceed to the question of whether Bigge's damages are consequential rather than direct.

As noted, the UCC provides that a buyer's remedy includes direct damages, which are those that flow in the ordinary course from the breach. The UCC does not define consequential damages, which are sometimes referred to as "special" damages. See Cal. Com. Code § 1305, cmt. 3. Instead, the Code relies on the principles relating to consequential damages that have been developed in contract law generally. Id. In contract law generally, the leading case concerning consequential damages is the famous Hadley v. Baxendale, 9 Ex. 341, 156 Eng. Rep. 145 (1854). In that case, the plaintiffs owned a mill and experienced a broken crank shaft. They needed to send the broken shaft to the manufacturer so that the manufacturer could use it as a model for a new one. The plaintiffs contracted with the defendants, who were common carriers, to transport the shaft to the manufacturer. The plaintiffs informed the defendants that they were in a hurry, and the defendants promised that the shaft could be delivered to the manufacturer in a day's time. However, due to the carrier's neglect, delivery of the shaft was delayed, with the result that the mill's replacement shaft arrived several days later than expected. The plaintiffs did not have a spare shaft on hand, and so the plaintiffs could not operate their mill during the period of delay caused by the carrier's neglect. The plaintiffs thus sought to recover, as damages for the carrier's breach of contract, the lost profits for the period of delay. The court held that the plaintiffs could not recover lost profits, and this holding

6

was based on the distinction between direct and consequential damages (although the court did not use those terms). In making this distinction, the court first identified the general rule governing damages:

> Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as the probable result of the breach of it.

Id. at 151. The court then identified a subset of these damages—now known as consequential damages—as those that would ordinarily follow from a breach of contract under "special circumstances." Id. The court reasoned that if the defendant knew about the plaintiff's special circumstances at the time of entering the contract, then the defendant should be liable for the damages ordinarily following a breach of contract under those circumstances; however, if the defendant did not know about the plaintiff's special circumstances, then the defendant should not be liable for those damages. With respect to the mill's lost profits, the court observed that the carrier had no reason to know that the mill would not be able to operate and generate profits while the shaft was in transit, since one would ordinarily expect a mill to have a spare shaft on hand so that it could continue operations in the event that the shaft in use broke. Because the carrier did not know about the mill's "special circumstances"—i.e., that it did not keep a spare shaft on hand—the carrier could not be held liable for the damages attributable to those special circumstances.

Like most courts, those in California follow Hadley v. Baxendale. See Lewis Jorge Constr. Mgmt., Inc. v. Pomona Unified Sch. Dist., 102 P.3d 257, 262 (2004). Thus, for purposes of the present case, the distinction between direct and consequential damages

7

can be stated as follows: Direct damages are those that Rexnord, at the time of contracting, would reasonably have expected to follow from its breaches, assuming that it did not have knowledge of any circumstances peculiar to Bigge—circumstances analogous to the mill's not having a spare shaft on hand. Thus, Bigge's direct damages are those that Rexnord would reasonably have expected an ordinary purchaser of metal castings to incur in the event that Rexnord delivered the castings late or failed to carry out its obligation to perform a root cause analysis. In contrast, Bigge's consequential damages are those that Rexnord, at the time of contracting, would reasonably have expected to follow from its breaches under any circumstances that are peculiar to Bigge. Under the rule of Hadley, Rexnord would be liable for such consequential damages if Bigge had communicated its special circumstances to Rexnord at the time of contracting. However, because in this case the parties have agreed to exclude all consequential damages, Rexnord is not liable for consequential damages even if Bigge is able to prove that Rexnord knew about its special circumstances. Thus, the key question is whether the damages Bigge claims are those that Rexnord would reasonably have expected an ordinary purchaser of metal castings to incur as a result of its breaches. See Applied Data Processing, Inc. v. Burroughs Corp., 394 F. Supp. 504, 509–10 (D. Conn. 1975).

With respect to Rexnord's alleged failure to perform an adequate root cause analysis, it is clear that the expenses Bigge reasonably incurred in hiring separate consultants to perform the analysis, as well as any of its own, internal resources reasonably incurred in performing the analysis, would be direct damages. This is so because, at the time of contracting, Rexnord would have known that if it did not properly perform a needed root cause analysis, an ordinary purchaser of metal castings would have

8

to incur expenses in connection with either performing that analysis itself or hiring someone else to perform the analysis. In other words, there was nothing special about Bigge's circumstances that caused it to incur such expenses. Thus, any expenses Bigge reasonably incurred to obtain the root cause analysis called for by the contract are recoverable, assuming of course that Bigge is able to establish that Rexnord breached the root cause analysis provision of the contract in the first place.[2]

However, whether Rexnord is liable for the expenses Bigge incurred because of Rexnord's breach of its scheduling obligations cannot be decided now. To decide whether such expenses are direct or consequential, I would need to know whether Rexnord should have expected an ordinary purchaser of metal castings to incur them or whether they were the result of Bigge's special circumstances. For example, Bigge claims that it incurred "personnel" and "equipment" expenses as a result of the delay. Should Rexnord have expected an ordinary purchaser of metal castings to incur these expenses, or would Rexnord have been justified in assuming that the purchaser would have arranged its affairs such that it could have used its personnel and equipment on other projects while it waited for Rexnord to deliver the castings, thereby avoiding any wasted expense? The record does not shed any light on that question. Similarly, the record does not enable me to determine whether an ordinary purchaser of castings would have incurred the additional expenses that Bigge paid to Schuff Steel. Accordingly, given the present state of the

---

[2]Bigge has not moved for summary judgment on the question of whether Rexnord breached the root cause analysis provision. Rather, it has moved for summary judgment as to liability only as to Rexnord's alleged breach of its "scheduling obligations." See Mot. for Partial Summ. J. at 1, ECF No. 25.

Case 2:12-cv-00261-LA   Filed 04/12/13   Page 9 of 14   Document 44

record, I cannot grant summary judgment to either party on the question of whether Bigge's delay-related expenses constitute consequential damages.

Bigge contends that if any of its damages fall within the contract's exclusion of incidental and consequential damages, then the contract's limited remedies should be deemed to have failed of their essential purpose. This argument is based on UCC § 2-719(2), which states that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this code." Usually, this provision comes into play when a contract contains an exclusive repair-or-replace remedy and the seller is unable or unwilling to repair or replace the goods. <u>See</u> White & Summers, <u>supra</u>, § 13-10, p. 603. However, in the present case, we are not dealing with an exclusive repair-or-replace remedy or any similar exclusive remedy. Although an exclusion of consequential damages might be considered a "limited remedy," I do not see how the parties' agreement to exclude consequential damages could possibly have failed of its essential purpose in the present case. Bigge argues that the contract's scheduling provisions were very important to it, and that it would be deprived of the benefit of those provisions if the exclusion of consequential damages were enforced. However, this argument makes little sense. If Rexnord's breach of the scheduling provisions caused Bigge direct damages, then Bigge will have a remedy. If Bigge's damages are all consequential, then of course it will not have a remedy, but that is because Bigge agreed that it would not pursue Rexnord for consequential damages. Presumably, Bigge was able to negotiate a lower price for the castings in exchange for this agreement. Having made this bargain, Bigge cannot now complain that it is being deprived of the benefit of the scheduling provisions. The benefit Bigge negotiated for was performance or, if no

10

performance, then direct damages.  Bigge allocated any risk of consequential damages stemming from Rexnord's failure to meet its scheduling obligations to itself.  Accordingly, the contract's limited remedies have not failed of their essential purpose.

The remaining question is whether Bigge is entitled to summary judgment as to Rexnord's liability for breach of its scheduling obligations.  Rexnord does not dispute that it failed to deliver the castings in accordance with the contract's original schedule.  However, it contends that this failure was not a breach because (a) Bigge waived its right to enforce compliance with the original schedule by accepting the castings when Rexnord delivered them; (b) Bigge's own acts and omissions caused the delay; and (c) Rexnord's delay was caused by force majeure.

With respect to waiver, the commercial terms make clear that Bigge could not have waived its right to enforce the schedule by accepting untimely delivery.  The terms state that "[a]cceptance of any items . . . shall not waive any breach," Quliter Decl. Ex 1, § 26, and that Rexnord's "liability shall not be deemed to have been waived by [Bigge's] acquiescence of late performance," id. § 27.4.  The terms do state that Rexnord's failure to comply with the schedule will not be considered a breach if Bigge "gives written approval of a revised schedule," id. § 27.2, but Rexnord does not point to any writing in which Bigge approved a revised schedule.[3]

Rexnord's other two arguments are related and can be analyzed together.  With respect to Bigge's own acts, Rexnord invokes the so-called "prevention doctrine," which

---

[3]In one of its briefs, Rexnord asserts that "the parties discussed an amended purchase order," Reply Br. at 15, ECF No. 35, but it does not contend that the parties actually entered into an amended purchase order containing a revised schedule.

11

provides that if one party to a contract hinders, prevents, or makes impossible performance by the other party, the latter's failure to perform will be excused.   See 13 Richard A. Lord, Williston on Contracts § 39:3 (4th ed. 2000).  Force majeure, like the prevention doctrine, deals with events beyond the breaching party's control, and Rexnord argues that the conduct of Bigge that hindered or prevented Rexnord from performing constituted force majeure.  Rexnord also contends that other events, such as a flood at its facility, constituted force majeure.

The commercial terms include a "force majeure" provision stating that "all events beyond a party's reasonable control" will be grounds for obtaining an extension of time. Quilter Decl. Ex. 1, § 11.  However, a later provision in the terms states that Rexnord may obtain an extension of time due to force majeure only if Rexnord notifies Bigge in writing within three business days that a force majeure event has occurred and that it needs an extension of time.  Id. § 27.5.  Here, Bigge contends that Rexnord never gave Bigge written notice that either Bigge's conduct or any other event outside Rexnord's control constituted force majeure, and that therefore Rexnord cannot now rely on force majeure or the prevention doctrine to avoid liability for its delays.

Rexnord contends that it did provide notice to Bigge.  However, the only evidence Rexnord cites in support of this contention appears in the declaration of one of its witnesses, Jamie Quilter, who states that "[o]n several occasions, Rexnord informed Bigge, both verbally and in writing, that its conduct constituted Force Majeure under California law and excused the dates Rexnord delivered the castings."  Second Quilter Decl. ¶ 50, ECF No. 37.  This evidence does not create a triable issue of fact on the question of whether Rexnord gave the required notice.  To begin with, I can disregard Quilter's reference to

12

verbal notice, since the contract required written notice. As for written notice, Quilter does not identify the writings in which Rexnord gave Bigge notice, and he does not even show that he has personal knowledge that Rexnord ever sent such writings—he does not state that he drafted or saw the writings or otherwise explain how he came to know that the writings were sent. For this reason, his statement about written notice (and verbal notice, for that matter) is inadmissible. See Fed. R. Evid. 602. But even if his statement were admissible and accepted as true, it would not establish that Rexnord complied with the notice requirement. As mentioned, the commercial terms required Rexnord to give notice that it was invoking the force-majeure clause within three days of becoming aware of the delay, yet Quilter does not provide any information from which a trier of fact could reasonably conclude that Rexnord's written notice was sent within three days. Thus, based on the present record, no reasonable trier of fact could conclude that Rexnord's delay was excused by force majeure or the prevention doctrine.[4] It follows that Rexnord has no viable defense to liability for failing to deliver the castings on time.

## CONCLUSION

For the reasons stated, **IT IS ORDERED** that Rexnord's motion for partial summary judgment is **DENIED**.

**IT IS FURTHER ORDERED** that Bigge's motion for partial summary judgment is **GRANTED IN PART** and **DENIED IN PART**. It is established that Rexnord breached the

---

[4]Although the notice provision in the contract mentions only force majeure and does not separately mention the prevention doctrine, Rexnord has not argued that the contract's notice requirement did not apply to delays excused by the prevention doctrine rather than force majeure. Rather, Rexnord treats the prevention doctrine as a subclass of force majeure. See Reply Br. at 20, ECF No. 35 (arguing that Bigge's conduct, which was beyond Rexnord's control, constituted force majeure).

13

contract by delivering the castings late; that none of Bigge's claimed damages constitute incidental damages; and that the expenses Bigge reasonably incurred in hiring separate consultants to perform the root cause analysis, as well as any other expenses reasonably incurred in performing the analysis, are direct damages stemming from any breach by Rexnord of its obligation to perform a root cause analysis. In all other respects, Bigge's motion is denied.

**FINALLY, IT IS ORDERED** that Rexnord's motion for confidential treatment is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 12th day of April, 2013.

s/ Lynn Adelman

_____
LYNN ADELMAN
District Judge

14